1

2

3

4                           UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    DOMINIC TYRELL DANIEL,                   Case No.  19-cv-03319-HSG

8                       Petitioner,           **ORDER DENYING PETITION FOR**
                                              **WRIT OF HABEAS CORPUS;**
9              v.                             **DENYING CERTIFICATE OF**
                                              **APPEALABILITY**
10   ROBERT NEUSCHMID,

11                      Respondent.

12

13          Petitioner, a state prisoner incarcerated at California State Prison - Solano,[1] has filed this

14   *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of

15   a conviction obtained against him in state court.  Dkt. No. 1 ("Pet.").  Respondent has filed an

16   answer.  Dkt. No. 14.   Petitioner has not filed a traverse, and the deadline to do so has since

17   passed.  The Court has carefully considered the briefs submitted by the parties.  For the reasons set

18   forth below, the petition is DENIED.

19                              **I.  PROCEDURAL HISTORY**

20          On April 29, 2015, an Alameda County jury found petitioner guilty of second degree

21   murder (Cal. Penal Code § 187(a)).  Ans., Ex. 1[2] ("CT") at 284.  On June 25, 2015, the trial court

22   sentenced him to fifteen years to life in state prison.  CT 350.

23           Petitioner appealed this conviction, arguing that the trial court erred in admitting general

24   expert testimony about domestic violence and in failing to give a limiting jury instruction that this

25   _____

26   [1] Petitioner initially named Robert Neuschmid as the respondent in this action.  In accordance with
     Rule 25(d) of the Federal Rules of Civil Procedure and Rule 2(a) of the Rules Governing Habeas
27   Corpus Cases Under Section 2254, the Clerk of the Court is directed to substitute Giselle
     Matteson, the current warden of California State Prison - Solano, in place of the previously named
28   respondent because Warden Matteson is petitioner's current custodian.
     [2] The exhibits to the Answer are docketed at Dkt. No. 14.

United States District Court
Northern District of California

1    testimony was not evidence that he committed the charged crime, and that trial counsel was

2    ineffective when he failed to object to the admission of this testimony and failed to request the

3    necessary limiting instruction.  Ans., Ex. 4.

4          On August 4, 2017, the California Court of Appeal affirmed the conviction in an

5    unpublished decision.  *People v. Daniel*, C No. A145854, 2017 WL 3327748 (Cal. Ct. App. Aug.

6    4, 2017).[3]  Ans., Ex. 7.  Petitioner filed a petition for review with the California Supreme Court,

7    arguing that the trial court committed reversible error in admitting Sergeant White's testimony

8    regarding the cycle of domestic violence and in failing to give a limiting instruction that Sgt.

9    White's testimony was not evidence that petitioner had committed the charged crime.  Ans., Ex. 9.

10   This petition for review was summarily denied on November 1, 2017.  Ans., Ex. 10.

11         On November 20, 2018, petitioner filed a petition for a writ of habeas corpus in the

12   California Supreme Court, alleging that (1) trial counsel was ineffective because he failed to have

13   petitioner take a psychological examination, failed to investigate a diminished mental capacity

14   defense, and failed to argue a heat of passion defense; (2) insufficiency of the evidence in that the

15   there was evidence of provocation that supported a conviction for voluntary manslaughter; and (3)

16   petitioner's confession was involuntary, in violation of the Fifth Amendment.  Ans., Ex. 11.  On

17   April 10, 2019, the California Supreme Court denied the habeas corpus petition as follows:

18         The petition for a writ of habeas corpus is denied.  (*See People v. Duvall* (1995) 9 Cal.  4th
           464, 474 [a petition for a writ of habeas corpus must include copies of reasonably available
19         documentary evidence]; *In re Dixon* (1953) 41 Cal.2d 756, 759 [courts will not entertain
           habeas corpus claims that could have been, but were not, raised on appeal]; *In re Swain*
20         (1949) 34 Cal.2d 300, 304 [a petition for a writ of habeas corpus must allege sufficient
           facts with particularity]; *In re Lindley* (1947) 29 Cal. 2d 709, 723 [courts will not entertain
21         habeas corpus claims that attack the sufficiency of the evidence].).

22   Ans., Ex. 12.

23         On June 12, 2017, petitioner filed the instant habeas petition.  On August 27, 2019, the

24   Court found that the petition stated the following claims: (1) counsel was ineffective for failing to

25

26   _____

27   [3] The California Court of Appeal initially filed its opinion on May 19, 2017.  *People v. Daniel*,
     C No. A145854, 2017 WL 2223915 (Cal. Ct. App. May 19, 2017).  After the remittitur issued on
     July 20, 2017, petitioner filed a motion to recall the remittitur to allow his appellate attorney to file
28   a petition for review.  On August 4, 2017, the California Court of Appeal issued an order to recall
     the remittitur, vacate its prior opinion, and reissue the opinion as of that date.  Ans., Ex. 8.

pursue a diminished mental capacity defense; (2) insufficient evidence to support the conviction;

(3) *Miranda* violation; and (4) ineffective assistance of appellate counsel for failing to raise these

three claims.  Dkt. No. 9.  Petitioner also raised a fifth claim which the Court failed to address in

its August 27, 2019 Order to Show Cause.  In his fifth claim, petitioner argues that the trial court

committed reversible error when it admitted the testimony of Sergeant White concerning the cycle

of domestic violence, and when it failed to give a limiting instruction specifying that Sergeant

White's testimony was not evidence that petitioner had committed the charged crime.  Dkt. No. 1

at 26-31.

## II.  BACKGROUND

The following factual background is taken from the August 4, 2017 opinion of the

California Court of Appeal:[4]

> A jury convicted defendant Dominic Daniel of second degree murder after he brutally beat
> to death his girlfriend, Tsega Tsegay, and the trial court sentenced him to 15 years to life in
> prison. [FN 1] On appeal, Daniel claims that the court erred by (1) admitting general expert
> testimony about domestic violence and (2) failing to instruct the jury that this testimony was
> not evidence that he committed the charged crime. [FN 2] We affirm.
>
> > FN 1: Daniel was convicted of murder under Penal Code section 187, subdivision
> > (a).
>
> > FN 2: Because we conclude that both claims fail on the merits, we need not address
> > Daniel's arguments that, to the extent either claim was forfeited by his failure to
> > object below, his trial counsel provided ineffective assistance of counsel.
>
> I.
>
> FACTS
>
> *A. Daniel and Tsegay's Relationship.*
> Daniel and Tsegay, an Ethiopian immigrant, met in 2009 and began dating. Both were
> alcoholics, and their relationship was marked by domestic violence.
>
> One of the key witnesses who testified about the couple's violent history was Patrick L.,
> who was 70 years old at the time of trial in 2015. He met Tsegay in the late 1990's and
> considered her to be like a daughter. She lived with him in his apartment in downtown
> Oakland and assisted him with daily tasks because he was legally blind. Daniel sometimes
> visited Tsegay at the apartment while Patrick L. was present. Patrick L. testified that Daniel
> was often drunk and "beating on [Tsegay] ... and fighting," and Tsegay said "many times"

---

[4] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. McDaniel*,
853 F.3d 1049, 1055 (9th Cir. 2017).  Based on the Court's independent review, the Court finds
that it can reasonably conclude that the state court's summary of facts is supported by the record
and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366
F.3d 992, 999–1000 (9th Cir. 2004), unless otherwise indicated in this order.

she was afraid of Daniel. On a few occasions, Patrick L. witnessed Daniel bite Tsegay's face. Daniel had also threatened to kill Tsegay, including once when Daniel was talking to his mother on the telephone and said, "I'm going to kill the bitch." Patrick L. testified that he never saw Tsegay start a fight with Daniel, although Patrick L. also admitted that she "was no angel with" her boyfriend.

During one incident in December 2010, Daniel tried to force his way into Patrick L.'s apartment. After Patrick L. opened the door, Daniel grabbed him by the throat, and Patrick L. attempted to hit Daniel with an ashtray. Daniel pushed his way inside and then attacked Tsegay, who was sleeping, by hitting her in the face until it looked like she had "golf balls in her mouth." Daniel made Tsegay leave with him, and Patrick L. called 911.

Officer Raymond Ward responded to the 911 call. He testified that he first spoke with Patrick L., who was "visibly upset and shaken." After leaving Patrick L.'s apartment, he got into his patrol car, drove about a block, and saw Daniel chasing Tsegay around a parked car. Officer Ward knew Tsegay because "[s]he walked around West Oakland," which was his beat, and was "very friendly." The officer saw Daniel punch Tsegay in the face "at least four times." Daniel stopped the attack only after Officer Ward intervened and arrested him. Both Daniel and Tsegay appeared intoxicated. Tsegay had "[s]wollen eyes and there was some blood," and Daniel did not have any injuries. Daniel pleaded no contest to a misdemeanor count of domestic battery based on this incident, and he was ordered to have no contact with Tsegay.

Police were called to Patrick L.'s apartment again in December 2011 for a report of domestic battery. This time, Officer Richardson San Andres responded. He testified that when he first arrived to the apartment, he spoke to Tsegay in the hallway. She was "a little nervous ... [and] a little frantic," and "[s]he had a minor laceration to the bridge of her nose" and dried blood on her shirt. Tsegay indicated that Daniel, who soon emerged from the elevator, had assaulted her, and Officer San Andres arrested him.

Another incident occurred in April 2012. This time, police were summoned to Daniel's mother's house in North Oakland based on a report that a man was preventing medical personnel from treating a victim inside the house. Officer Ward, who had responded to the first incident at Patrick L.'s apartment in December 2010, was among the first officers to respond. He approached Daniel, who was standing at the front door, and asked him whether someone inside the house was hurt. Daniel, who appeared to be intoxicated and had an "[a]ggressive" and "hostile" demeanor, responded, "No," but Officer Ward could see Tsegay standing inside with a "badly beaten" face. Daniel refused to allow the police inside to check on the house's occupants and turned to go inside himself, at which point Officer Ward and another officer grabbed Daniel to detain him. Daniel dropped to his knees, causing the two officers holding him to fall to the ground, and began to struggle. At one point, Daniel attempted to bite Officer Ward but was unable to inflict any injury because the officer was wearing a bulletproof vest. Daniel was finally subdued when more officers arrived to assist.

Officer Roberto Ruiz was one of the backup officers to arrive at the scene. He testified that when he arrived he saw Daniel on the ground "screaming" and resisting as other officers attempted to handcuff him. Daniel's mother and Tsegay, both of whom were inside the house, were yelling at the officers to let Daniel go. Officer Ruiz also knew Tsegay, whom he regularly saw on his beat. The officer characterized her as "calm, mellow," chatty, and "[v]ery friendly" when she was not drinking, which was about 80 percent of the time. When she was intoxicated, she would become "[v]ery loud" and "slur" her words, but the officer never saw her be aggressive.

After Daniel, who was uninjured, calmed down and was put in a patrol vehicle, Officer Ruiz took Tsegay outside to the ambulance. Tsegay "had golf[-]ball-sized lumps underneath each eye and a big fist lump on her head." Tsegay initially claimed that "girls beat her up," but once inside the ambulance she told Officer Ruiz that Daniel had hit her "[a] lotta times" and

she wanted to press charges. She also claimed that both she and Daniel were drunk, but she did not appear to the officer to be intoxicated. Daniel pleaded no contest to a felony count of false imprisonment based on this incident, and he was ordered to have no contact with Tsegay and Patrick L.

*B. Tsegay's Murder.*

### 1. The early-morning hours of July 31, 2012.

Daniel served about three months in jail as a result of the April 2012 incident, and he was released in late July 2012, about a week before the murder. Despite the active restraining order, Tsegay and Daniel arrived at Patrick L.'s apartment early on July 31. Tsegay was "upset about something" and spoke in a loud voice. Within a few minutes, Patrick L. asked the couple to leave, because in his experience "every time she's like that ... [Daniel] beats her up." Patrick L. testified that as the couple left, Tsegay picked up some eggs on the counter and threw or dropped them on the floor. Video footage from Patrick L.'s building showed two people who could have been Daniel and Tsegay leave at around 1:45 a.m.

Almost four hours later, at approximately 5:30 a.m., a woman out for a run on a path around Oakland's Lake Merritt was approaching a restaurant next to the lake. As she neared the restaurant's front entrance, an elderly Asian woman asked her to call 911. The runner immediately did so and followed the other woman around the building, where Tsegay was lying flat on the ground, apparently unconscious, and Daniel was standing nearby. The runner told the 911 operator that Daniel "said that [the woman] drank too much and passed out." The runner noticed that Tsegay "was half naked and her face was bloody," but it was not until later, after the sun came up, that the runner saw how much blood there was and "realized that it was more than just a passed out woman." At the 911 operator's direction, relayed by the runner, Daniel performed CPR on Tsegay until the paramedics and police arrived. [FN 3] Tsegay died at the hospital a few hours later. She was 33 years old.

> FN 3: The elderly woman left the scene at some point before the police arrived and was never interviewed.

### 2. Tsegay's autopsy.

A forensic pathologist testified that Tsegay's cause of death was an "extreme" level of blunt force trauma. Tsegay "had extensive trauma to her face," including two black eyes and hemorrhaging in and around the eyes; several abrasions to different areas of her face; and "extensive swollen lips" with an "extensively lacerated" upper lip. These injuries were consistent with Tsegay's having been repeatedly punched and kicked in the face. She had a large abrasion on the back of her head, numerous bruises on her scalp, and brain swelling, all of which were also the result of blunt force trauma to the head. Based on hemorrhaging in her neck tissue, it appeared she might have been strangled, but the pathologist testified that this hypothesis was impossible to confirm "because ... what one sees with strangulation," such as pinpoint hemorrhages on the eyeballs and inside the eyelids, had "been obliterated by blunt trauma to the face."

Tsegay had numerous abrasions on her torso indicating places where her skin had been scraped with some force, suggesting she had been dragged along the ground, and extensive bruising to her abdomen, suggesting she had been hit there several times. Internal lacerations, including injuries to her pancreas and spleen, indicated punches or kicks applied with a significant amount of force. There were also what appeared to be human bite marks on her back and one buttock. Her left femur (thigh bone) was fractured, which the pathologist testified is "a most unusual injury to see [in] someone who is being beaten" because it requires the application of an enormous amount of force when part of the leg is off the ground to snap the bone. Broken femurs are usually sustained in automobile accidents, and the pathologist testified that he initially had the impression that Tsegay was "thrown out of a car

in addition to obviously being beaten elsewhere."

Tsegay had very few defensive injuries, suggesting that she may have been unconscious or otherwise incapacitated during the attack. At the time of death, her blood-alcohol content was .38 percent, which the pathologist testified would cause her to "be severely impaired," but her level of intoxication did not contribute to her medical cause of death.

### 3. Other physical evidence at the scene.

A large amount of blood was discovered in an area on and around the lakeside path, beginning just south of the restaurant and stretching for over 70 feet. An evidence technician testified that "there appeared to be a lot of activity" based on several shoeprints, which were later matched to the boots Daniel was wearing; pools of blood of differing sizes; and drag marks. The testimony of an expert in bloodstain-pattern analysis suggested that the beating had begun in the northern area of the scene, where most of the impacts occurred, that Tsegay was on the ground while being hit, and that she had been dragged south and then north again, toward the lake.

Items Tsegay had been wearing were also scattered around the scene, including two pieces of a broken beaded necklace covered in blood; a bra, which was torn apart in the front where the cups met but was still fastened in back, that was wrapped up with a camisole with ripped front straps; and a red leather jacket found floating in the lake. A man's jacket with Tsegay's blood on the interior fleece lining was recovered from the path.

*C. Daniel's Statements.*

Officer Ryan McLaughlin responded to the scene at approximately 5:40 a.m. He testified that he activated the video-recording device on his uniform when he saw that Tsegay's face was bloody and swollen and became suspicious that it was not just a medical call. He asked Daniel for his name, and Daniel gave him accurate information. Referring to Patrick L. and Tsegay, Daniel volunteered, "My dad tell me that my wife was hurt so I came looking for her" at the lake. Daniel also said that *he* flagged down the runner and asked her to call 911. [FN 4]

> FN 4: Daniel claimed that he did not have a telephone number, and he later indicated that the cell phone he was carrying at the time had been out of service since he had gone to jail. In fact, the phone was in service and had been used to make an outgoing call several hours before the murder, but it was not used to make any calls that morning.

Officer McLaughlin then escorted Daniel, who did not seem intoxicated, to the patrol vehicle to take a statement from him.  [FN 5] Daniel's pants were damp from the knees down, and there was diluted blood, later determined to be Tsegay's, on the cuffs and stomach area of his shirt. Upon being asked his name again, Daniel gave his brother's name instead of his own. When Officer McLaughlin confronted him about this discrepancy, Daniel insisted that his brother's information was correct and indicated that he had initially given the wrong information because he "was just probably really scared" and did not "know what the fuck was going on with [Tsegay]."

> FN 5: When Daniel's blood was drawn at around 10:45 a.m., his blood-alcohol content was .14 percent.

Daniel then repeated the story that Patrick L. had told him to look for Tsegay, that he had discovered her by the lake, and that he had asked the runner for help. Officer McLaughlin decided to detain Daniel, handcuffed him, and left him in the back of the patrol vehicle. While the officer was gone, Daniel was recorded talking to himself at length, including saying that he had not done anything to Tsegay and would have left the scene if he "was so fucking guilty." When Officer McLaughlin returned, Daniel said, "I ain't a fucking murderer

1

or nothing."

2

Officer McLaughlin confronted Daniel with the photograph of Daniel's brother that had come up in the system, and Daniel insisted that it was his own. Daniel became angry and said, "What, you all charge me for lying to the police? ... Shit, that bitch was on the ground. Them people is telling me and the bitch to do 911. Bitch is already leaking. ... I never man, I'm innocent. I ain't did nothing to that girl." When told he was being arrested for attempted murder, Daniel repeatedly claimed that he had merely been trying to resuscitate Tsegay and would have left the scene if he had done something wrong.

3

4

5

After Daniel was taken to the police station, he was placed in an interview room where he was recorded for the next several hours. He spent much of the time while he was alone waiting to be interviewed talking to himself. At first, while Daniel still believed Tsegay was alive, he told himself that he had not done anything wrong and blamed her for the situation. saying, "She always gets drunk and do stupid ass shit. Now I'm in trouble behind her dumbass shit. ... She needs to fix this shit real fast. ... She gots to—she's got to tell these motherfuckers what the fuck really happened to her. These motherfuckers thinking I'm doing something to her trying to help her out 'cause she's so drunk. ... I'm just sitting here for some shit I didn't do." Daniel also rehearsed his story, saying to himself, "I went looking for her. Earlier that night she got into it with her dad. She walked off and went by herself somewhere man. I'm not fucking lying blood. ... I went looking for her. I went all around downtown. I went downtown and I can't cause she over by the lake where she go. ... I didn't murder shit."

6

7

8

9

10

11

12

Sergeant Eric Milina conducted the formal interview of Daniel later that afternoon. Daniel admitted that he had violated the restraining order barring him from contact with Tsegay. He initially told a story that comported with what he had been recorded telling himself earlier. He claimed that the previous day he and Tsegay were at Patrick L.'s apartment until around 3:00 p.m. Tsegay got into an argument with Patrick L., and she and Daniel left and "walk[ed] around and [got] drunk." About an hour later, they returned to the apartment, and Tsegay fought with Patrick L. again. She and Daniel left again, drank more, and returned to the apartment again. Tsegay and Patrick L. fought yet again, and she and Daniel then went to Daniel's mother's house.

13

14

15

16

17

Daniel claimed that he and Tsegay eventually left his mother's house, went to a liquor store, and then took the bus back to downtown Oakland, where they returned to Patrick L.'s apartment for a third time. Tsegay and Patrick L. got into another argument, after which she left alone. Using a map, Daniel gave a detailed description of where he walked in downtown Oakland as he tried to find her. He stated that he finally arrived at Lake Merritt less than an hour after leaving Patrick L.'s apartment, and he heard Tsegay yelling and discovered her in the water. Daniel said he got in the water and was "tryin' to lift—get her up 'cause she can't swim." [FN 6]

18

19

20

21

22

FN 6: The evidence suggested that Lake Merritt was approximately six to eight inches deep for several feet out from the shore near where Tsegay was killed.

23

Daniel, who is right-handed, had significant swelling to his right hand. After Sergeant Milina remarked on this, Daniel initially claimed that his hand was swollen from lifting Tsegay out of the water or from giving the blood sample but then stated that his hand was "always ... swollen" and there was nothing wrong with it. A doctor who examined Daniel later that night, however, suspected based on the swelling that Daniel had "a fighter's fracture or boxer's fracture," which can be caused by striking something hard with the outside of one's fist. The doctor testified that, although x-rays did not reveal a fracture, Daniel had sustained "trauma to the hand that fell short of breaking the bone but was enough to cause swelling ... [and] pain."

24

25

26

27

28

Sergeant Milina eventually asked Daniel whether he had seen "the Asian lady," who "had a

United States District Court
Northern District of California

lot to say," and Daniel appeared surprised. Sergeant Milina also confronted Daniel with the fact his bloody shoeprints were all over the scene and said there could be video of the attack on Tsegay. When the sergeant then said he wanted to know the truth, Daniel replied, "If, if I gotta take it sayin' that I did it, I did it, fuck it." Daniel claimed that he could not recall assaulting Tsegay but said, "If y'all say I got physical evidence, videos and stuff, ... if I did it I did it."

Another officer entered the room and indicated, as an interview tactic, that Tsegay had reported that Daniel beat her up. Daniel then admitted that he had done so but continued to claim he could not remember the details. Eventually, however, he suggested that he may have become angry because "she did admit she was sleepin' with a married man" while he was in jail. Daniel also stated that Tsegay often attacked him when she had been drinking, and he claimed that she hit him while they were on the bus back to Patrick L.'s apartment because he said he was going to leave her. [FN 7]

> FN 7: AC Transit was unable to locate any surveillance footage showing that Daniel or Tsegay had ridden the bus line Daniel claimed they were on that night, much less that she had hit him.

Toward the end of the interview, Sergeant Milina informed Daniel that Tsegay had died. Daniel then said he had not intended to kill her but admitted that he had lost control when he began attacking her. After the officers left the room and Daniel was alone, he was recorded repeatedly saying, "I murdered my girlfriend, blood" and "I killed my baby."

*Daniel*, 2017 WL 3327748, at *1-*5.

## III.  DISCUSSION

### A.  Standard of Review

A petition for a writ of habeas corpus is governed by AEDPA.  This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the

United States District Court
Northern District of California

jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005).[5] Petitioner raised the first three of his habeas claims in his state habeas petition. The California Supreme Court's April 10, 2019 decision was the only

---

[5] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default. *Barker*, 423 F.3d at 1092 n.3 (citing *Lambert v. Blodgett*, 393 F.3d 943, 970 n.17 (9th Cir. 2004), and *Bailey v. Rae*, 339 F.3d 1107, 1112–13 (9th Cir. 2003)). The look through rule is applicable here as the Ninth Circuit has held that "it is a common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is 'contrary to' or 'an unreasonable application of' clearly established federal law" and "it [is] unlikely that the Supreme Court intended to disrupt this practice without making its intention clear." *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

reasoned state court decision that addressed these three claims.  Accordingly, in reviewing these three claims, the Court reviews the California Supreme Court's April 10, 2019 decision.  The California Court of Appeal's August 4, 2017 opinion was the last reasoned state court decision that addressed the fifth claim.  Accordingly, in reviewing the fifth claim, the Court reviews the California Court of Appeal's August 4, 2017 opinion.

When it is clear that a claim was not adjudicated on the merits in state court, for instance because the state court invoked a procedural rule that is not a procedural bar to considering the claim in the federal habeas proceeding, the claim is subject to *de novo* review.  *See Taylor v. Beard*, 811 F.3d 326, 331 n.3 (9th Cir. 2016) (en banc) (conducting *de novo* review where state courts rejected claim on procedural grounds and did not consider merits); *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002) (after concluding that claim was not procedurally barred, conducting *de novo* review because state supreme court never reached merits of the claim).

## B.     Petitioners' Claims

### 1.     Ineffective Assistance of Counsel

Petitioner argues that trial counsel was ineffective because he failed to have petitioner undergo a psychiatric examination and because he failed to pursue a diminished mental capacity defense and/or a heat of passion defense.  He argues that the following evidence supported these defense theories:  petitioner and the victim had a tumultuous relationship with "lots of violence between them;" petitioner's blood alcohol level indicated that he did not plan, and was incapable of planning, the attack; petitioner was unable to comprehend the victim's fear; and petitioner suffered from mental illness.  Dkt. No. 1 at 9-11.  Respondent argues that these claims are unexhausted and also fail on the merits.

#### a.     Exhaustion

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are first required to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  *See* 28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509, 515–16 (1982);

United States District Court
Northern District of California

*Duckworth v. Serrano*, 454 U.S. 1, 3 (1981); *McNeeley v. Arave*, 842 F.2d 230, 231 (9th Cir. 1988).  The state's highest court must be given an opportunity to rule on the claims even if review is discretionary.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (petitioner must invoke "one complete round of the State's established appellate review process.").  The exhaustion requirement is not jurisdictional, but rather a matter of comity.  *See Granberry v. Greer*, 481 U.S. 129, 133–34 (1987).  However, a district court may not grant the writ unless state court remedies are exhausted or there is either "an absence of available state corrective process" or such process has been "rendered ineffective."  *See* 28 U.S.C. § 2254(b)(1)(A)–(B).  The court may deny a habeas petition on the merits even if it is unexhausted.  *See* 28 U.S.C. § 2254(b)(2); *Runningeagle v. Ryan*, 686 F.3d 758, 777 n.10 (9th Cir. 2012).

Respondent argues that this claim is unexhausted because it was denied as procedurally deficient.  Respondent is correct that only the *Swain* and *Duvall* citations in the California Supreme Court's denial apply to the ineffective assistance of counsel claims.[6]  However, citations to *Swain* and *Duvall* do not *per se* establish a failure to exhaust.  *See Kim v. Villalobos*, 799 F.2d 1317, 1319-1320 (9th Cir. 1986); *Campos v. Adams*, No. 2:05-CV-00108-AK, 2012 WL 3881200, at *4 (E.D. Cal. Sept. 6, 2012) (Kozinski, J., sitting by designation).  *Duvall* stands for the proposition that a petition must "include copies of reasonably available documentary evidence supporting the claim," *People v. Duvall*, 9 Cal. 4th 464, 474 (1995), and *Swain* stands for the proposition that a habeas petition should "state fully and with particularity the facts on which relief is sought," *In re Swain*, 34 Cal. 2d 300, 304 (1949).  The Ninth Circuit has held that a citation to *Duvall* and *Swain* together constitutes "dismissal without prejudice, with leave to amend to plead required facts with particularity."  *Seeboth v. Allenby*, 789 F.3d 1099, 1104 n.3

---

[6] The *Dixon* and *Lindley* citations cannot apply to ineffective assistance of counsel claims.  *In re Dixon*, 41 Cal.2d 756 (Cal. 1953) holds that California courts will not entertain habeas corpus claims that could have been, but were not, raised on appeal.  *Dixon*, 41 Cal.2d at 759.  The California Supreme Court has held that *Dixon* does not apply to ineffective assistance of counsel claims.  *See In re Robbins*, 18 Cal.4th 770, 814 n.34 (Cal. 1998) ("We do not apply [the *Dixon* bar (barring claims that were not raised on appeal)] . . . to claims of ineffective assistance of trial counsel, even if the habeas corpus claim is based solely upon the appellate record.").  *Lindley* holds that California courts will not entertain habeas corpus claims that attack the sufficiency of the evidence, *In re Lindley*, 29 Cal. 2d 709, 723 (Cal. 1947), and therefore the *Lindley* bar is inapplicable to ineffective assistance of counsel claims.

(9th Cir. 2015) (citing *Cross v. Sisto*, 676 F.3d 1172, 1177 (9th Cir. 2012).  While the failure to return to the California Supreme Court can be construed as a failure to exhaust, the Ninth Circuit has held that where a petitioner has alleged his claim with as much particularity as practicable, a denial by the state court for lack of particularity "amounts to a holding that the claims themselves are defective" and will not be deemed a failure to exhaust.  *See Kim*, 799 F.2d at 1320.  The Ninth Circuit has instructed federal courts to independently examine the state petition to determine whether the claim was fairly presented with sufficient particularity.  *Kim*, 799 F.2d at 1320.

This Court has independently reviewed the state habeas petition and finds that petitioner fairly presented his ineffective assistance of trial counsel claim to the California Supreme Court. In his state habeas petition, petitioner explained the basis for his claim that counsel was ineffective by pointing to evidence in the record that he believed supported a diminished mental capacity or heat of passion defense, along with citations to relevant portions of the court transcript.  *See* Answer, Ex. 11.  Petitioner argued that the evidence showed that the victim and petitioner had a tumultuous relationship with lots of violence between them, that his sister's testimony indicated that he had symptoms of bipolar disorder, and that he had been diagnosed with PTSD resulting from suffering emotional and physical abuse as a child and growing up in a family of alcoholics. *See* Answer, Ex. 11 (Dkt. No. 14-13 at 27-28).  On the basis of these allegations, the Court concludes that petitioner fairly presented his ineffective assistance of counsel claims to the California Supreme Court, and these claims are exhausted.

        **b.**        **Merits Analysis**

            **1)**        **Standard for Ineffective Assistance of Counsel Claims**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id.* In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things.

First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687–88. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687. The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689.

Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

A federal habeas court considering an ineffective assistance of counsel claim need not address the prejudice prong of the *Strickland* test "if the petitioner cannot even establish incompetence under the first prong." *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, the court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *Daire v. Lattimore*, 812 F.3d 766, 767–68 (9th Cir. 2016); *see also Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Cullen*, 563 U.S at 190; *Harrington v. Richter*, 562 U.S. 86, 88–89 (2011) (same); *Premo v. Moore*, 562 U.S. 115, 122 (2011) (same). The general rule of *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are

13

objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). When Section 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

### 2) Analysis

Petitioner argues that trial counsel was ineffective because he did not pursue either a diminished mental capacity defense or a heat of passion defense, and because he failed to investigate such defenses by having plaintiff undergo psychiatric testing. Petitioner argues that if trial counsel had pursued either of these defenses the outcome would have been different for the following two reasons. First, the defense pursued by trial counsel, imperfect self-defense, was not supported by the evidence because there was no evidence that petitioner was in imminent danger. Second, the evidence supported both the diminished mental capacity defense and the heat of passion defense. His high blood alcohol content level proved that he was not fully aware of his actions and could not understand the victim's fear. The evidence that he suffered from PTSD, suffered from emotional and physical abuse in his childhood, became an alcoholic in his early teens, was raised among and by alcoholics, and displayed symptoms of bipolar disorder in that he was either extremely friendly or extremely sad, all supported a finding of diminished mental capacity.

The Court has carefully reviewed the record and finds no evidence that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.

Petitioner cannot establish incompetence under the first prong of *Strickland*. As respondent correctly points out, trial counsel did argue a heat of passion defense, RT 839, 840-51, 923, 927-994, and trial counsel could not have argued diminished mental capacity as that defense was abolished by California in 1982, *see People v. Saille*, 54 Cal.3d 1103, 1111 (Cal. 1991). The United States Supreme Court has never required defense counsel to pursue every nonfrivolous claim or defense, regardless of its merit, viability, or realistic chance of success. *Knowles v. Mirzayance*, 556 U.S. 111, 125, 127 (2009). Counsel abandoning a defense that has "almost no

14

1    chance of success" is reasonable, even if there is "nothing to lose" by preserving the defense. *Id.*

2    at 1419-20.

3            Affording a heavy measure of deference to trial counsel's judgment, the Court also finds

4    that trial counsel's decision to order only a psychological examination, rather than a psychiatric

5    examination, for petitioner was also reasonable under the circumstances. *Silva v. Woodford*, 279

6    F.3d 825, 836 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 491) (*Strickland* directs that "'a

7    particular decision not to investigate must be directly assessed for reasonableness in all the

8    circumstances, applying a heavy measure of deference to counsel's judgments.'").  A defense

9    attorney has a general duty to make reasonable investigations or to make a reasonable decision

10   that makes particular investigations unnecessary.  *See Strickland*, 466 U.S. at 691; *Hinton v.*

11   *Alabama*, 134 S. Ct. 1081, 1088 (2014) (per curiam).

12           Here, there is nothing in the record that establishes that it would have been reasonable to

13   investigate whether petitioner had PTSD, bipolar disorder, or any other psychiatric disorder.  The

14   record reflects neither a PTSD diagnosis nor significant evidence of PTSD.  And according to the

15   probation report, petitioner described his overall upbringing as "smooth and stable," and denied

16   having been subjected to, or witness to, abuse or neglect of an emotional, physical, or sexual

17   nature as a child.  CT 372.   It was not unreasonable for trial counsel to forgo investigating

18   whether petitioner suffered from PTSD at the time of the charged conduct.

19           Similarly, there is no conclusive diagnosis of a bipolar or psychiatric disorder in the

20   record.  Nor is there anything in the record indicating the strong likelihood of a bipolar or

21   psychiatric disorder.  Petitioner's arguments that the record shows that he had PTSD and was

22   bipolar mischaracterize the record.  Petitioner claims that his probation reports show that, while

23   housed in county jail on an unrelated charge, he was diagnosed as having PTSD as a result of

24   years of lashings and emotional abuse and from living with a family with multiple alcoholics.

25   Dkt. No. 1 at 9.  However, the probation report makes no mention of a PTSD diagnosis or a

26   troubled childhood.  Instead, the probation report reports that, when arrested at age 17, petitioner

27   reported that the "most traumatic event in his life is drinking."  CT 379.  Petitioner also claims that

28   his sister's testimony that he would be either extremely friendly or extremely sad indicated that he

United States District Court
Northern District of California

15

showed symptoms of bipolar testimony.  Petitioner mischaracterizes his sister's testimony.  In response to a question about petitioner's character when he was drinking, she testified that, when drinking, sometimes petitioner would be friendly and sometimes he would be emotional.  RT 801.  Her description was limited to petitioner's behavior when drinking.  She did not conclude or imply that he suffered from any psychiatric disorder.

Absent any objective indication that petitioner suffered from any mental illness, trial counsel cannot be deemed ineffective for failing to investigate whether petitioner suffered from PTSD, bipolar disorder, or a psychiatric disorder.  *See, e.g., Gonzales v. Knowles*, 515 F.3d 1006, 1015-16 (9th Cir. 2008) (where mental illness seemed unlikely, there was no deficient performance or prejudice in counsel's decision to not investigate or call witnesses regarding defendant's mental health problems as potential mitigating factors at sentencing, notwithstanding suggestions of previous counsel); *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (that counsel knew defendant had been beaten, without more, did not render decision not to investigate possibility of psychiatric defense unreasonable).

Because petitioner "cannot even establish incompetence under the first prong," the Court need not address the prejudice prong of the *Strickland* test.  *Siripongs*, 133 F.3d at 737.  Petitioner has failed to demonstrate ineffective assistance of counsel.  Federal habeas relief is denied on these claims.

### 2.      Insufficiency of the Evidence Claim

Petitioner argues that there was insufficient evidence to support his conviction for second-degree murder because there was insufficient evidence to conclude that he possessed the necessary intent.  Respondent argues that this claim is procedurally defaulted and fails on the merits.

#### a)      Procedural Default

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment.  *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991).  In the context of direct review by the United States Supreme Court, the "adequate and independent state ground" doctrine goes to jurisdiction; in federal habeas cases, in whatever court, it is a matter of comity

16

and federalism.  *Id.*  The procedural default rule is a specific instance of the more general "adequate and independent state grounds" doctrine.  *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir. 1994).  In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.  The cause standard requires the petitioner to show that "'some objective factor external to the defense impeded counsel's efforts'" to construct or raise the claim."  *McClesky v. Zant*, 499 U.S. 467, 493 (1991) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Objective factors that constitute cause include interference by officials that makes compliance with the state's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel.  *See id.* at 493–94. Petitioner also must show actual prejudice resulting from the errors of which he complains.  *See McCleskey*, 499 U.S. at 494; *United States v. Frady*, 456 U.S. 152, 168 (1982).  Petitioner bears the burden of showing not just that errors at his trial created a possibility of prejudice, but that they "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Frady*, 456 U.S. at 170 (emphasis in original).  To ascertain the extent to which such errors taint the constitutional sufficiency of the trial, they must be evaluated in the total context of the events at trial.  *See Paradis v. Arave*, 130 F.3d 385, 393 (9th Cir. 1997) (citing *Frady*, 456 U.S. at 169).

If a state prisoner cannot meet the cause and prejudice standard, a federal court may still hear the merits of the procedurally defaulted claim if the failure to hear the claim would constitute a "miscarriage of justice."  *See McQuiggin v. Perkins*, 569 U.S. 383, 391–92 (2013) (holding that miscarriage of justice (actual innocence) showing applies to procedurally defaulted claims).  The Supreme Court limits the "miscarriage of justice" exception to habeas petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citing *Murray*, 477 U.S. at 496); *see Johnson v. Knowles*, 541 F.3d 933, 936–38 (9th Cir. 2008) ("[t]he miscarriage of justice exception

1    is limited to those extraordinary cases where the petitioner asserts his innocence and establishes

2    that the court cannot have confidence in the contrary finding of guilt.").  "To be credible, [an

3    actual innocence] claim requires petitioner to support his allegations of constitutional error with

4    new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness

5    accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.

6    This does not mean a petitioner need always affirmatively present physical evidence that he did

7    not commit the crime with which he is charged.  *Gandarela v. Johnson*, 286 F.3d 1080, 1086 (9th

8    Cir. 2002).  The required evidence must create a colorable claim of actual innocence (i.e., that the

9    petitioner is innocent of the charge for which he is incarcerated, as opposed to legal innocence as a

10   result of legal error).  *Schlup*, 513 U.S. at 321.  It is not enough that the evidence show the

11   existence of reasonable doubt: petitioner must show "that it is more likely than not that no

12   reasonable juror would have convicted him."  *Id.* at 329 (internal quotation marks omitted).  As

13   the Ninth Circuit has put it, "the test is whether, with the new evidence, it is more likely than not

14   that no reasonable juror would have found [p]etitioner guilty."  *Van Buskirk v. Baldwin*, 265 F.3d

15   1080, 1084 (9th Cir. 2001); *see, e.g., Carriger v. Stewart*, 132 F.3d 463, 478 (9th Cir. 1997) (en

16   banc) (petition qualified for *Schlup* gateway on a showing that chief prosecution witness had

17   confessed to crime under oath in postconviction court and that prosecution had failed to produce

18   file disclosing that witness was known liar).

19            The California Supreme Court denied this claim with a citation to *In re Lindley*, 29 Cal. 2d

20   709 (Cal. 1947), which holds that sufficiency of the evidence claims cannot be raised in a state

21   habeas petition.  The *Lindley* procedural bar is an independent and adequate state ground, and its

22   application by the California Supreme Court to this claim bars federal haabeas review.  *Carter v.

23   Giurbino*, 385 F.3d 1194, 1198 (9th Cir. 2004).  Petitioner has not demonstrated that this Court

24   can nevertheless consider his claim.  He has not demonstrated either (1) cause for the default and

25   actual prejudice as a result of the alleged violation of federal law, or (2) that failure to consider the

26   claims will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.  Petitioner's

27   claim that appellate counsel was ineffective in failing to raise this claim on appeal cannot

28   constitute cause for the default.  For ineffective assistance of appellate counsel to constitute cause

United States District Court
Northern District of California

18

for procedural default of a federal habeas claim, the ineffective assistance of appellate counsel claim must first have been presented to the state courts as an independent claim. *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986) (exhaustion doctrine "generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default"). Petitioner did not present an ineffective assistance of appellate counsel claim to the state courts, whether in his petition for review or his state habeas petition. *See* Answer, Exs. 9 and 11. This claim is therefore procedurally defaulted and may not be considered on federal habeas review. Regardless, this claim also fails on the merits.

**b)**      **Merits Analysis**

**1)**      **Standard**

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, which, if proven, entitles him to federal habeas relief. *See Jackson v. Virginia*, 443 U.S. 307, 321, 342 (1979). The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ." *Coleman v. Johnson*, 556 U.S. 650, 651 (2012) (per curiam) (finding that appellate court "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court collaterally reviewing a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992); *see, e.g.*, *Coleman*, 556 U.S. at 656 ("the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

19

beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt has there been a due process violation.  *Jackson*, 443 U.S. at 324.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326.  The court may not substitute its judgment for that of the jury.  *See Coleman*, 566 U.S. at 655-57 (finding that appellate court erred in finding that there was no reasonable basis for the jury's conclusion that petitioner had a specific intent to kill victim and force was used simply because there was no testimony describing physical action by petitioner).  Indeed, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)) (finding that appellate court erred by substituting its judgment for that of California jury on the question whether the prosecution's or defense's expert witnesses more persuasively explained the cause of death)).

The *Jackson* standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.  *Jackson*, 443 U.S. at 324 n.16.  However, the "the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 566 U.S. at 655.

In sum, sufficiency claims on federal habeas review are subject to a "twice-deferential standard." *Parker*, 567 U.S. at 43.  First, relief must be denied if, viewing the evidence in the light most favorable to the prosecution, there was evidence on which "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 324).  Second, a state court decision denying a sufficiency challenge may not be overturned on federal habeas unless the decision was "objectively unreasonable." *Id.* (quoting *Cavazos*, 565 U.S. at 2).

**2)      Analysis**

Petitioner argues that there was insufficient evidence that he possessed the necessary intent

United States District Court
Northern District of California

for second-degree murder and that the evidence only supported a conviction for manslaughter. Specifically, petitioner argues that there was overwhelming evidence of provocation given the testimony that the victim also abused alcohol and had a high blood alcohol content at the time of the incident; that the victim and petitioner had a history of being violent towards each other; that petitioner suffered scratches on his face during the relevant incident; and that immediately preceding the incident, the victim revealed that she had an affair with a married man while petitioner was incarcerated, hit petitioner, and pulled a knife on petitioner. Petitioner also argues that there was evidence proving a lack of express malice or intent to kill because there was evidence that petitioner loved the victim; that petitioner willingly cooperated with the police; that petitioner was concerned both after the victim was rendered unconscious and after he was detained; and that, at the time of the incident, petitioner was abusing alcohol and suffering from PTSD. Dkt. No. 1 at 13-18.

> The California Supreme Court has explained the intent required for murder as follows:
> A conviction for murder requires the commission of an act that causes death, done with the mental state of malice aforethought (malice). (Cal. Penal Code § 187.) Malice may be either express or implied. (Cal. Penal Code § 188.) Express malice is an intent to kill. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102, 13 Cal.Rptr.2d 864, 840 P.2d 969.) Implied malice does not require an intent to kill. Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses. (*People v. Knoller* (2007) 41 Cal.4th 139, 152, 59 Cal.Rptr.3d 157, 158 P.3d 731.). . . .
>
> The law recognizes two degrees of murder. The degrees are distinguished by the mental state with which the killing is done. A person who kills unlawfully with implied malice is guilty of second degree murder. (*People v. Knoller*, *supra*, 41 Cal.4th at pp. 151–152, 59 Cal.Rptr.3d 157, 158 P.3d 731.) A person who kills unlawfully and intentionally is guilty of first degree murder if the intent to kill is formed after premeditation and deliberation. (§ 189; *see People v. Mendoza* (2011) 52 Cal.4th 1056, 1069, 132 Cal.Rptr.3d 808, 263 P.3d 1.) If the person kills unlawfully and intentionally but the intent to kill is not formed after premeditation and deliberation, the murder is of the second degree. (*People v. Nieto Benitez*, supra, 4 Cal.4th at p. 102, 13 Cal.Rptr.2d 864, 840 P.2d 969.)

*People v. Gonzalez*, 54 Cal. 4th 643, 653 (Cal. 2012) (footnote omitted). "[A] defendant who unlawfully kills without express malice due to voluntary intoxication can still act with implied malice . . .To the extent that a defendant who is voluntarily intoxicated unlawfully kills with implied malice, the defendant would be guilty of second degree murder." *People v. Turk*, 164 Cal. App. 4th 1361, 1376-77 (Cal. Ct. App. 2008).

Where an intentional and unlawful killing occurs "upon a sudden quarrel or heat of passion" (Cal. Penal Code § 192 (a)), the malice aforethought required for murder is negated, and the offense is reduced to voluntary manslaughter—a lesser included offense of murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 153–154, 77 Cal.Rptr.2d 870, 960 P.2d 1094.) Such heat of passion exists only where "the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an '"ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.""' (*Id.* at p. 163, 77 Cal.Rptr.2d 870, 960 P.2d 1094.) To satisfy this test, the victim must taunt the defendant or otherwise initiate the provocation. (*People v. Spurlin* (1984) 156 Cal.App.3d 119, 125–126, 202 Cal.Rptr. 663; *e.g., People v. Berry* (1976) 18 Cal.3d 509, 512–515, 134 Cal.Rptr. 415, 556 P.2d 777 [young wife repeatedly subjected older husband to sexual insults, rejection, and admissions of infidelity, causing him to strangle her in jealous rage]; cf., *People v. Manriquez* (2005) 37 Cal.4th 547, 585–586, 36 Cal.Rptr.3d 340, 123 P.3d 614 [provocation lacking where defendant calmly shot bar patron who insulted and goaded him into firing]; *see also People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144, 124 Cal.Rptr.2d 373, 52 P.3d 572 [revenge does not reduce murder to manslaughter].)

*People v. Carasi*, 44 Cal. 4th 1263, 1306 (Cal. 2008).

Applying the twice-deferential standard due sufficiency of the evidence claims on federal habeas review, the Court finds that petitioner's conviction did not violate the Due Process Clause.

Viewing the evidence in the light most favorable to the prosecution, there was evidence from which a rational trier of fact could have found that petitioner willfully did an act, the natural and probable consequences of which was dangerous to human life, and that he knowingly acted with conscious disregard for the danger to life that the act posed.  There was evidence that the petitioner used extreme levels of blunt force trauma repeatedly on Tsegay, dragged her along the ground for approximately seventy feet, and ripped her clothing.  A rational trier of fact could reasonably conclude that petitioner's assault on Tsegay was extremely violent and took place over a period of time, indicating that petitioner knowingly acted with conscious disregard for the danger to Tsegay's life.  Petitioner argues that he was too intoxicated to form the requisite intent.  However, under California law, intoxication does not establish, as a matter of law, that a petitioner acted without express malice.  Cal. Penal Code § 29.4(a) ("Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.").  Rather, under California law, a jury decides whether the evidence of voluntary intoxication establishes that the intoxicated person did not act with implied malice.  Cal. Penal Code § 29.4(a).  Moreover, there is evidence in the record

1     from which a reasonable factfinder could conclude that petitioner was not so intoxicated as to

2     render him unable to act with implied malice.  When Officer McLaughlin took a statement from

3     petitioner around 5:40 a.m., Officer McLaughlin observed that petitioner did not seem intoxicated.

4     In addition, viewing the evidence in the light most favorable to the prosecution, there was

5     also evidence from which a rational trier of fact could reasonably conclude that there was no

6     provocation.  Multiple witnesses testified that Tsegay did not physically attack petitioner when

7     drinking, and that, in prior domestic violence incidents, it was Tsegay, and not petitioner, who was

8     physically assaulted and injured.  RT 228-29, 232, 258, 289-90, 377-79, 305, 322, 819-20, 822.

9     Finally, a rational trier of fact could reasonably conclude that petitioner's statements regarding the

10    provocation were not credible.  Petitioner was not truthful with police officers during the initial

11    encounter at Lake Merritt and throughout the interrogation.  Because the Court finds that a rational

12    trier of fact could have found proof of guilt beyond a reasonable doubt, there is no due process

13    violation.

14    This claim is both procedurally defaulted and fails on the merits.  Federal habeas relief is

15    denied on this claim.

16    **3.     Involuntary Confession Claim**

17    Petitioner argues that his confession was involuntary because he was intoxicated and

18    suffering from PTSD at the time he made his confession.  Dkt. No. 1 at 18-25.  Respondent argues

19    that this claim is procedurally defaulted and fails on the merits.

20    **a.     Procedural Default**

21    As discussed *supra*, a federal court will not review questions of federal law decided by a

22    state court if the decision also rests on a state law ground that is independent of the federal

23    question and adequate to support the judgment.  *Coleman*, 501 U.S. at 729–30.  Here, the

24    California Supreme Court denied this claim with a citation to *In re Dixon*, 41 Cal.2d 756 (Cal.

25    1953), which holds that a claim is barred if the petitioner failed to raise it on direct appeal.  The

26    *Dixon* rule is both an adequate and independent state procedural rule, and the state court's denial

27    of this claim on *Dixon* grounds bars federal habeas review.  *Johnson v. Lee*, 136 S. Ct. 1802,

28    1803-04 (2016).  Petitioner has not demonstrated that this Court can nevertheless consider his

1    claim.  He has not demonstrated either (1) cause for the default and actual prejudice as a result of

2    the alleged violation of federal law, or (2) that failure to consider the claims will result in a

3    fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.  As discussed *supra*, petitioner's

4    claim that appellate counsel was ineffective for failing to raise the involuntary confession claim on

5    direct appeal cannot constitute cause for the default because no claim of ineffective assistance of

6    appellate counsel was presented to the state courts as an independent claim.  *Murray*, 477 U.S. at

7    488–89.  This claim is therefore procedurally defaulted and may not be considered on federal

8    habeas review.  Regardless, this claim also fails on the merits.

9                      **B.      Voluntariness of Confession**

10                            **1)      Legal Standard**

11        Involuntary confessions in state criminal cases are inadmissible under the Fourteenth

12   Amendment.  *Blackburn v. Alabama*, 361 U.S. 199, 207 (1960).  A confession is voluntary if it is

13   "the product of an essentially free and unconstrained choice;" it is involuntary where the suspect's

14   "will has been overborne and his capacity for self-determination critically impaired."  *Culombe v.*

15   *Conn.*, 367 U.S. 568, 602 (1961).  The voluntariness of a confession is evaluated by reviewing

16   both the police conduct in extracting the statements and the effect of that conduct on the suspect.

17   *Miller v. Fenton*, 474 U.S. 104, 116 (1985).  Absent police misconduct causally related to the

18   confession, there is no basis for concluding that a confession was involuntary in violation of the

19   Fourteenth Amendment.  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

20        To determine the voluntariness of a confession, the court must consider the effect that the

21   totality of the circumstances had upon the will of the defendant.  *Schneckloth v. Bustamonte*, 412

22   U.S. 218, 226-27 (1973).  "The test is whether, considering the totality of the circumstances, the

23   government obtained the statement by physical or psychological coercion or by improper

24   inducement so that the suspect's will was overborne."  *United States v. Leon Guerrero*, 847 F.2d

25   1363, 1366 (9th Cir. 1988) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)).  "The

26   factors to be considered include the degree of police coercion; the length, location and continuity

27   of the interrogation; and the defendant's maturity, education, physical condition, mental health,

28   and age."  *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011) (citations omitted).  The erroneous

United States District Court
Northern District of California

admission of a coerced confession is subject to harmless error analysis.  *Fulminante v. Arizona*, 499 U.S. 279, 306-12 (1991).  In other words, habeas relief is appropriate only if the coerced confession had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Pope v. Zenon*, 69 F.3d 1018, 1025 (9th Cir. 1995) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

### 2)    Analysis

Because the Court agrees that the admission of the confession was harmless, the Court does not address petitioner's arguments regarding the voluntariness of his confession.  Habeas relief is appropriate only if the coerced confession had a substantial and injurious effect or influence in determining the jury's verdict.   Here, there was overwhelming circumstantial evidence, separate from petitioner's confession, that petitioner killed Tsegay.  Petitioner was the last person to be seen with Tsegay, four hours prior to her death; petitioner was found at the scene of her death; petitioner's pants had Tsegay's diluted blood on them; petitioner's right hand had significant swelling that could be caused by striking something hard with the outside of one's fist; and petitioner had a history of assaulting Tsegay.  The admission of petitioner's confession, even if erroneous, was harmless.

Federal habeas relief is therefore on this claim.

### 4.    Ineffective Assistance of Appellate Counsel Claim

Petitioner argues that appellate counsel was ineffective for failing to raise the above three claims on direct appeal.  Dkt. No. 1 at 25-31.  Respondent argues that this claim is unexhausted and fails on the merits.  Dkt. No. 14-1 at 36-38.

As discussed *supra*, prisoners in state custody who challenge the validity of their conviction in federal habeas proceedings must first exhaust their state court remedies.  *See* 28 U.S.C. § 2254(b).  Here, petitioner did not present an ineffective assistance of appellate counsel claim to the state courts, whether in his petition for review or his state habeas petition.  Answer, Exs. 9 and 11.  Accordingly, this claim is unexhausted.  However, the Court may deny an unexhausted claim which is plainly meritless, as is the case here.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the

1    effective assistance of counsel on his first appeal as of right.  *Evitts v. Lucey*, 469 U.S. 387, 391-

2    405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the

3    standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Smith v. Robbins*, 528 U.S.

4    259, 285 (2000); *Moormann v. Ryan*, 628 F.3d 1101, 1106 (9th Cir. 2010).  First, the petitioner

5    must show that counsel's performance was objectively unreasonable, which in the appellate

6    context requires the petitioner to demonstrate that counsel acted unreasonably in failing to

7    discover and brief a potentially meritorious issue.  *Smith*, 528 U.S. at 285; *Moormann*, 628 F.3d at

8    1106.  Second, the petitioner must show prejudice, which in this context means that the petitioner

9    must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the

10   issue, the petitioner would have prevailed in his appeal.  *Smith*, 528 U.S. at 285-86; *Moormann*,

11   628 F.3d at 1106.  Appellate counsel does not have a constitutional duty to raise every

12   nonfrivolous issue requested by defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983);

13   *Miller v. Keeney*, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989).  The weeding out of weaker issues is

14   widely recognized as one of the hallmarks of effective appellate advocacy.  *See id.* at 1434.

15   Appellate counsel therefore will frequently remain above an objective standard of competence and

16   have caused his client no prejudice in declining to raise a weak issue.  *Id.*

17          These three claims are plainly non-meritorious and weak.  Trial counsel was not ineffective

18   for failing to order a psychiatric exam for petitioner where there was no evidence in the record that

19   established conclusively, or even indicated that it was likely, that petitioner suffered from PTSD,

20   bipolar disorder, or any other psychiatric disorder.  Trial counsel was not ineffective for failing to

21   pursue a heat of passion defense because he did argue a heat of passion defense.  And trial counsel

22   was not ineffective for failing to pursue a diminished mental capacity defense because that defense

23   was abolished by California in 1982.  There was also sufficient evidence presented from which a

24   rational factfinder could conclude that petitioner acted with implied malice, given the evidence

25   that an extreme level of blunt force trauma was required to cause the injuries suffered by Tsegay;

26   that the assault took place over a period of time; that petitioner was not so intoxicated as to be

27   unable to act with implied malice, and that petitioner was not credible.  Finally, the admission of

28   the confession did not have a prejudicial effect given the significant evidence that petitioner acted

United States District Court
Northern District of California

with implied malice.  For this reason, appellate counsel did not act unreasonably in not raising

these claims, and this decision did not cause petitioner prejudice.  Petitioner is not entitled to

federal habeas relief on this claim.

### 5.    Evidentiary Error and Instructional Error

Petitioner argues that the trial court erred in admitting Sgt. White's testimony because

(1) the testimony was not relevant within the meaning of Cal. Evid. Code § 210 and Fed. R. Evid.

702(a) and because California caselaw has limited the admissibility of testimony regarding

intimate partner battering, and (2) admission of Sgt. White's testimony violated Cal. Evid. Code §

1107 in that it was offered to prove petitioner's guilt by claiming that an ever-increasing cycle of

violence existed between petitioner and Tsegay that would inevitably end in petitioner killing

Tsegay.  In the alternative, petitioner argues that if the testimony were properly admitted, the trial

court erred in failing to give a limiting instruction regarding the testimony.  Dkt. No. 1 at 26-31.

The state appellate court denied this claim as follows.

*A. The Trial Court Properly Admitted Expert Testimony on Domestic Violence.*
Daniel claims that the trial court erred by admitting expert testimony about domestic
violence because the testimony (1) was not relevant to any disputed issue and (2) violated
Evidence Code [FN 8] section 1107, subdivision (a), which prohibits the admission of such
testimony "when offered against a criminal defendant to prove the occurrence of the act or
acts of abuse which form the basis of the criminal charge." We are not persuaded.

FN 8:  All further statutory references are to the Evidence Code.

1. Additional facts.
Before trial, the prosecution filed a motion in limine seeking to call Sergeant Randy White
to testify "as an expert in the area of domestic violence, specifically regarding the Cycle of
Violence and Battered Woman's Syndrome." The motion explained that such evidence "may
be used by the prosecution to disabuse the jury of commonly held misconceptions about
domestic violence. It may be used to explain why a victim would recant an[ ] earlier
description of the facts, delay reporting [an] assault[,] or remain with the defendant after [a]
crime was committed."

During a discussion of the prosecution's motion, Daniel's trial counsel questioned whether
such testimony was relevant. The trial court observed that the testimony would address the
"ways in which a person who was a victim of domestic violence may behave," information
"that the average juror may not be familiar with" and that would help jurors to understand
what would otherwise seem like an "unreasonable, or irrational, or not logical" response to
domestic violence. The court then determined that the testimony was admissible, although it
also ruled that Sergeant White could not refer to "Battered Woman Syndrome" based on a
concern that the term "would be overly persuasive to the jury."

At trial, Sergeant White was qualified "as an expert in the area of domestic violence
investigation and common behaviors and characteristics of those cases." He explained that

abusive relationships commonly reflect a "cycle of violence." The cycle begins with a positive relationship, when "everything is beautiful." Then there is "a tension[-]building stage" during which the victim knows the abuser is "getting upset, it's kind of walking on egg shells," until "the eruption phase," when actual physical or emotional abuse occurs. Sergeant White testified that the tension-building phase is not necessarily precipitated by anything the victim has done, because "it's about what's going on in the abuser's head" and his need for control. [FN 9] Indeed, the sergeant agreed that it is "common" for an abuser to become violent "where the victim literally did nothing at all" or is even asleep.

> FN 9: Sergeant White referred to a hypothetical abuser as "he" and a hypothetical victim as "she" because "the overwhelming majority of victims of domestic violence are women" abused by men, but the sergeant emphasized that "anybody can be a victim of domestic violence."

Sergeant White testified that after the eruption phase comes "the honeymoon phase," during which "the abuser feels completely bad for what he's done" and is apologetic and loving toward the victim, causing her to "accept[ ] him back." From there, the couple returns to the tension-building stage, and the cycle begins again. After a while, the "honeymoon stage starts getting shorter and shorter, ... because an abuser has done a real good job of convincing the victim, hey, it's really your fault why we're in this situation," until that stage vanishes because the abuser no longer feels a need to apologize.

Sergeant White testified that victims are often reluctant to involve the authorities because they do not want their abusers to go to jail and they do not want to reveal their private business to others. When the authorities do become involved, the victim is likely to either "minimize or deny that the violence even took place or just recant [altogether]." In other cases, the victim will call the police as a way of stopping the violence in the moment with no intention of pressing charges. Even when the abuser is successfully prosecuted for domestic violence, the victim may well take him back again.

According to Sergeant White, there is usually "a dominant abuser" in a violent relationship, although it is possible for a victim to become abusive toward her abuser. As the cycle continues, the level of violence tends to escalate, to the point that "it happens quite often" that an abuser will finally kill the victim, particularly if he feels he has lost control over her.

Sergeant White also addressed the role of alcohol abuse in domestic violence. He explained that although laypeople often believe that certain violent episodes would not have occurred had the abuser not been drinking, "in actuality when you have an abuser [he is] an abuser whether [he is] drunk or not. Now, when the person is drunk, now you have a drunk abuser. [¶] ... [A]lcohol doesn't play much of a role as to whether or not [a victim] is going to be abused, because the violence is going to come whether [the abuser is] drunk or not." The sergeant did acknowledge, however, that it is possible for drinking to lead to domestic violence in that it may lower an abuser's inhibitions and self-control.

## 2. Discussion.

Section 1107 allows both the prosecution and the defense to introduce "expert testimony ... regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence." (§ 1107, subd. (a).) Such testimony is inadmissible, however, "when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (*Ibid.*)

Testimony admitted under section 1107 must be relevant evidence, that is, "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§§ 210, 350, 1107, subd. (a).) There are "two major

components to a relevance analysis in this context. First, there must be sufficient evidence in the particular case to support a contention that [intimate partner battering] applies to the woman [or man] involved. [Citation.] Second, there must be a contested issue as to which [intimate partner battering] testimony is probative." (*People v. Gadlin* (2000) 78 Cal.App.4th 587, 592.)

We review the trial court's evidentiary rulings, including the admission of expert testimony, for an abuse of discretion. (*People v. Lucas* (2014) 60 Cal.4th 153, 226; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9.)

Daniel does not contest that there was sufficient evidence that Tsegay was a victim of domestic violence. Instead, he claims that Sergeant White's testimony was not relevant because it did not fall into either of the "two distinct areas in which testimony concerning 'intimate partner battering and its effects' ... is admissible in criminal cases": where offered by the prosecution on the issue of the victim's credibility, and where offered by the defense to support a claim of self-defense. Although those may be the two most common contexts in which such expert testimony is admitted, neither section 1107 nor any other authority provided by Daniel limits the admission of such testimony to *only* those two contexts. (See § 1107, subds. (a)-(b); see also *People v. Gadlin, supra*, 78 Cal.App.4th at p. 592.)

In any event, Sergeant White's testimony *was* relevant to the issue of Tsegay's credibility. Daniel claims that the defense never challenged her credibility, but "there is no requirement that the defendant explicitly challenge a witness's credibility on a basis that might be explained by [intimate partner battering] evidence before such evidence may be introduced." (*People v. Riggs* (2008) 44 Cal.4th 248, 293.) As our state Supreme Court explained, "[E]xpert [intimate partner battering] testimony is relevant to explain that it is common for people who have been physically and mentally abused to act in ways that may be difficult for a layperson to understand. ... The relevance of this evidence is based on the possibility that the jurors will doubt that a witness who claims to have been abused has indeed acted in the manner to which he or she testified, and therefore the jurors might unjustifiably develop a negative view of the witness's credibility. [Citation.] Even if the defendant never expressly contests the witness's credibility along these lines, there is nothing preventing the jury from ultimately finding in its deliberations that the witness was not credible, based on misconceptions that could have been dispelled by [intimate partner battering] evidence. Thus, there is no need for the defendant first to bring up the potential inconsistency between a witness's actions and his or her testimony before the prosecution is entitled to attempt to dispel any misperceptions the jurors may hold by introducing [intimate partner battering] evidence ...." (*Ibid.*)

We recognize, of course, that Tsegay did not testify. But her statements about the April 2012 incident leading to Daniel's conviction for false imprisonment were introduced at trial. When Officer Ruiz spoke to Tsegay at the time, she initially claimed that "girls" had beaten her up, but she then said that Daniel had hit her. The April 2012 incident was one of the main instances of past domestic violence on which the prosecution's case was based, and Tsegay's latter statement was direct evidence that Daniel was the perpetrator. Thus, even though Daniel did not argue that Tsegay was lying, Sergeant White's testimony about victims' reluctance to be truthful with the authorities was relevant to explain Tsegay's behavior and inconsistent statements. (See *People v. Riggs, supra*, 44 Cal.4th at p. 293; § 210.)

We also agree with the Attorney General that Sergeant White's testimony was relevant to rebut Daniel's claims that Tsegay had abused Daniel and that he killed her in the heat of passion or imperfect self-defense after she attacked him. Daniel's trial counsel argued that "there was mutual domestic violence between the parties" and that Tsegay also abused Daniel, including in a February 2010 incident for which she "was arrested for domestic violence toward him." [FN 10] Counsel claimed that before her death Tsegay provoked Daniel by telling him she had had an affair and "attacked him first," causing him to go into

"a rage." Counsel also suggested that the couple's alcoholism, not domestic violence, was responsible for Tsegay's death. The expert testimony answered these points because Sergeant White testified that (1) an abuser can erupt into violence even if the victim has done nothing to precipitate it; (2) it is possible for a victim to become violent toward the abuser, but there is usually "a dominant abuser" in the relationship; and (3) alcohol use alone does not cause someone to be abusive toward a partner.

> FN 10: Sergeant Milina testified that he was aware of a police report in which Tsegay was listed as the aggressor against Daniel, because "the allegation was she slapped him," but no further details about the incident emerged.

Daniel also argues that Sergeant White's testimony was inadmissible because it was offered solely to prove he killed Tsegay. According to him, "[t]he prosecutor's theory in this case, pure and simple, was that [he] intentionally killed Tsegay in the culmination of an ever-increasing 'cycle of violence' that was inevitable, based on [his] psychological profile as an abuser." But it was undisputed that Daniel beat Tsegay to death, and his intent in doing so was the primary issue for the jury to decide. We do not read section 1107's bar on using expert testimony about domestic violence "to prove the *occurrence* of the act or acts of abuse which form the basis of the criminal charge" to be a categorical bar on using such testimony to prove a defendant's intent in committing those acts. (§ 1107, subd. (a), italics added.) We therefore conclude that the trial court did not abuse its discretion by admitting Sergeant White's testimony because the testimony was relevant to Tsegay's credibility and Daniel's intent.

*B. Any Error in the Omission of a Limiting Instruction on Sergeant White's Testimony Was Harmless.*

Daniel also claims that the trial court erred by not giving a limiting instruction to inform the jury that Sergeant White's testimony was not evidence that he committed the charged crime.

As we have said, under section 1107, subdivision (a), expert testimony about domestic violence is inadmissible when offered "to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." Both CALCRIM No. 850—which is given when expert testimony on domestic violence is offered by the prosecution on the issue of the victim's credibility—and CALCRIM No. 851—which is given when such testimony is offered by the defense on the issue whether a defendant who is a victim of domestic violence acted in self-defense—include language instructing that such testimony "is not evidence that the defendant committed any of the crimes charged against (him/her)." (CALCRIM Nos. 850, 851.)

Daniel's trial counsel never asked for an instruction reflecting this principle. On appeal, Daniel argues that such an instruction should have been given by the trial court sua sponte and the Attorney General argues to the contrary. We need not resolve this dispute because we conclude that any error, if there was one, was harmless. At the outset of Sergeant White's testimony, the trial court emphasized that Sergeant White had not been "a percipient witness to any of the incidents that [c]ounsel will be presenting information about. That is[,] he was not on the scene and didn't interview anybody. We're just going to be asking him some questions about his general knowledge of a subject matter." In addition, in response to the first two questions on direct examination, the sergeant confirmed that he had not been involved in investigating Tsegay's murder and did not "know anything about the case at all." Thus, it was apparent to the jury that Sergeant White's testimony was not offered to establish that Daniel in particular had committed a crime. Moreover, there was extensive evidence to support the conclusion that Daniel and Tsegay had a violent relationship and, as already stated, Daniel's identity as Tsegay's killer was undisputed. Therefore, even if the court had a duty to instruct the jury sua sponte that Sergeant White's testimony was not evidence that Daniel had murdered Tsegay, it is not reasonably probable that Daniel would have received a more favorable verdict had the instruction been given. (*People v. Watson* (1956) 46 Cal.2d

United States District Court
Northern District of California

1    818, 836; *People v. Housley* (1992) 6 Cal.App.4th 947, 959 [failure to give limiting instruction sua sponte assessed for prejudice under *Watson*].)

2    *Daniel*, 2017 WL 3327748, at *6-*9.

3              **a)      Evidentiary Error**

4              To the extent that this claim alleges errors of state law, federal habeas relief does not lie for

5    errors of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Failure to comply with state

6    rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief.

7    *See also Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).

8              The due process inquiry on federal habeas review is whether the admission of evidence

9    was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *Walters v. Maass*, 45

10   F.3d 1355, 1357 (9th Cir. 1995).  The Court has carefully considered the record and finds that the

11   admission of Sgt. White's testimony does not warrant federal habeas relief.

12             Petitioner's evidentiary claim is a legal claim in that it challenges whether Sgt. White's

13   testimony was legally or constitutionally admissible.  He argues that Sgt. White's testimony

14   rendered the trial fundamentally unfair because the jury could, and did, rely on that testimony as

15   evidence that he had the requisite intent for second degree murder.

16             However, even assuming *arguendo* that Sgt. White's testimony was offered for the

17   purpose of proving that petitioner harbored the requisite intent for second degree murder and was

18   understood as such by the jury, the admission of such testimony was not contrary to, and did not

19   involve an unreasonable application of, clearly established Federal law, as determined by the

20   Supreme Court of the United States.  The United States Supreme Court has left open the question

21   whether the Constitution is violated by the admission of expert testimony concerning an ultimate

22   issue to be resolved by the trier of fact.  *See Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009).

23   Because no Supreme Court case has squarely addressed this issue, the state court's denial of this

24   claim was not contrary to or an unreasonable application of clearly established Supreme Court

25   precedent.  *Stevenson v. Lewis*, 384 F.3d 1069, 1071 (9th Cir. 2004) ("If there is no Supreme

26   Court precedent that controls a legal issue raised by a petitioner in state court, the state court's

27   decision cannot be contrary to, or an unreasonable application of, clearly-established federal

28   law.") (citing *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004)); *see, e.g., Briceno v. Scriber*, 555

United States District Court
Northern District of California

31

F.3d 1069, 1078 (9th Cir. 2009) (habeas relief not available under Section 2254(d) for claim that expert's opinion testimony as to whether hypothetical robberies would have been gang-related because "there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue."); *Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011) (habeas relief not available under Section 2254(d) for claim that expert testimony to show improper interrogation methods should have been admitted because Supreme Court has not squarely addressed the issue; citing *Moses*, 555 F.3d at 758-59).

Clearly established Federal law does not require the exclusion of testimony offered to prove an ultimate issue to be resolved by the trier of fact, such as guilt of the crime. For that reason, the admission of this testimony did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Federal habeas relief is denied as to this claim.

### b) Instructional Error

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See id.* The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)) (failure to define recklessness was at most an error of state law where recklessness was relevant to negate duress defense and government did not bear the burden of proving duress). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155). The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156); *see id.* at 972 (due process violation found in capital case where petitioner demonstrated that application of wrong statute at sentencing infected proceeding with

1    potential confusion regarding jury's discretion to impose life or death sentence).

2         For the same reasons that the Court denied federal habeas relief with respect to the

3    admission of Sgt. White's testimony, the Court denies federal habeas relief with respect to the trial

4    court's failure to *sua sponte* instruct that Sgt. White's testimony could not be used as evidence of

5    petitioner's guilt for second degree murder.  As explained above, the admission of Sgt. White's

6    testimony to prove an ultimate issue to be resolved by the trier of fact has not been held to be

7    unconstitutional.  Therefore, no limiting instruction was needed and no prejudice resulted from the

8    failure to give such a limiting instruction.  The state court's denial of this claim of instructional

9    error was therefore not contrary to, and did not involve an unreasonable application of, clearly

10   established Federal law, as determined by the Supreme Court of the United States.

11        Nor was the denial based on an unreasonable determination of the facts in light of the

12   evidence presented in the State court proceeding.  The state court reasonably determined that the

13   failure to give a limiting instruction did not deprive the petitioner of a fair trial.  The trial

14   cautioned the jury prior to Sgt. White's testimony that Sgt. White was not a percipient witness to

15   the relevant events and was only testifying as to his general knowledge regarding domestic

16   violence.  RT 334.  The jury was instructed that it was not required to accept expert evidence as

17   true and should carefully assess the credibility and reliability of the expert witness.  RT 978-79.

18   Petitioner's identity as Tsegay's killer was undisputed, and, as discussed above in Section

19   III.B.2.b.2, there was evidence other than Sgt. White's testimony that supported the finding of

20   second-degree murder.

21        Federal habeas relief is denied as to this claim.

22                          **IV. CERTIFICATE OF APPEALABILITY**

23        The federal rules governing habeas cases brought by state prisoners require a district court

24   that issues an order denying a habeas petition to either grant or deny therein a certificate of

25   appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).

26        A judge shall grant a certificate of appealability "only if the applicant has made a

27   substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

28   certificate must indicate which issues satisfy this standard.  *Id.* § 2253(c)(3).  "Where a district

33

court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## V. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated:  11/16/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge